UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) No.:1:12-cr-148 |
| v. | ) |
| | ) Collier/Carter |
| | ) |
| TIMOTHY JOE SWALLOWS | ) |

REPORT AND RECOMMENDATION

I. Introduction

Defendant Timothy Joe Swallows' Motion to Suppress (Doc. 54) is before the undersigned Magistrate Judge having been referred by the District Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). Defendant is charged with various federal drug crimes. Defendant asserts Deputy Darren Miller lacked probable cause to detain him, to arrest him, and to search his vehicle. He also seeks suppression of any and all evidence seized by law enforcement on the ground Defendant did not knowingly, intelligently, and voluntarily waive his *Miranda* rights before making any statements. Defendant asserts he did not fully understand his rights prior to waiving them and that his interrogation took place in a coercive environment. I disagree and for reasons stated herein, I RECOMMEND the Defendant's motion to suppress be DENIED.

II. Relevant Facts

An evidentiary hearing was held on Friday, June 28, 2013. Deputies Darren Miller and Tim Robinson and Detective Zechary Pike were the only witnesses to testify. Defendant Swallows presented no evidence. Deputy Darren Miller is employed by the Bradley County

Sheriff's Office where he has been a deputy sheriff for the last five years. His duties include making traffic stops, responding to calls, and anything else patrol related. Deputy Tim Robinson is also employed by the Bradley County Sheriff's Office where he has been a patrol officer for eight years. Deputies Miller and Robinson were both working patrol from 7:00 am to 7:00 pm on the day in question. Detective Zechary Pike is employed by the Bradley County Sheriff's Office where he has served for ten years. Detective Pike previously worked in burglary and theft before transferring to the narcotics and special investigation unit in 2012.

On June 17, 2012, Deputy Miller was stationary on Wildwood Lake Road when he observed a vehicle traveling at a high rate of speed towards him. The radar revealed the vehicle was traveling at a speed of 40 mph in a 30 mph zone, after which Deputy Miller initiated a traffic stop. After stopping the vehicle, Deputy Miller approached the vehicle and noticed the driver was male and there was a female passenger. The male driver identified himself as Timothy Swallows, and the female passenger identified herself as Amber Flowers. Deputy Miller asked Swallows for his driver's license, but Swallows said he did not have one.

Deputy Miller noticed a strong odor of alcohol coming from the vehicle, and Swallows told Deputy Miller that he had been drinking and that he was drinking when Deputy Miller pulled him over. Deputy Miller asked Swallows to step out and go to the rear of his vehicle. Deputy Miller then returned to his patrol vehicle where he asked for a background check on Swallows and Flowers. Deputy Miller stated running background checks was standard procedure because of the high number of people stopped with outstanding warrants. Deputy Miller also stated that it was done for officer safety as he was alone at the time. Deputy Miller then commenced a field sobriety test. Three standard Bradley County sobriety tests were given to Swallows: the one-legged stand, the horizontal gaze nystagmus, and the walk and turn. The

three tests are primarily used to determine if someone is under the influence of alcohol or another type of depressant, but Deputy Miller does not know how effective the tests are for determining if someone is under the influence of a stimulant. Deputy Miller indicated Swallows passed those tests.

Deputy Robinson arrived on the scene while Deputy Miller was still administering the field sobriety tests to Swallows. Deputy Robinson stated that if one officer is making a traffic stop then other officers will assist. After Deputy Miller completed the field sobriety test, Deputy Robinson informed Deputy Miller that Swallows' license had been revoked, and Flowers had an outstanding warrant for methamphetamine precursors. Swallows was taken into custody for driving on a revoked license and speeding. Deputy Miller placed Swallows in the back of the squad car. Deputy Miller testified that he could have simply issued a citation to Swallows, but he arrested him pursuant to Bradley County policy (Doc. 59, Government Exhibit A). Once Swallows was placed in the squad car, Deputy Miller went to the passenger side where Deputy Robinson and Deputy Guthrie, another officer at Bradley County Sheriff's Office, were talking to Flowers. Flowers was arrested on the outstanding warrant. Deputy Robinson read Flowers her *Miranda* rights. After Flowers had been read her *Miranda* rights, Deputy Miller asked Flowers if she had anything illegal on her to which Flowers replied she did not have anything. Deputy Miller took Flowers around to the other side of the vehicle and asked Flowers once more if she had anything illegal on her. Flowers then asked Deputy Miller to shake her bra and search her himself. Deputy Miller told Flowers that he would not, but he did uncuff Flowers. Flowers pulled her shirt and took one bag of methamphetamine out of her bra. A second bag of methamphetamine fell to the ground. The entire stop took approximately fifteen to twenty minutes. Deputies Miller and Robinson indicated the stop took place in a high crime area where

3

stops were previously made related to drug activity.

Following the arrests of Swallows and Flowers, the officers searched the vehicle. The officers did not ask Swallows who owned the vehicle but performed an inventory search of the vehicle pursuant to Bradley County's standard policies (Doc. 59, Government's Exhibit A). Miller also testified that there was probable cause for the search based on the methamphetamine found on Flowers. Deputy Miller noted that this particular area of Bradley County was a high crime area as he has found more narcotics in this area than anywhere else in the county. Deputy Miller testified that the vehicle would not have been impounded if methamphetamine had not been found on Flowers. Deputies Miller, Robinson, Guthrie, and Corporal Daniel Marlow conducted the search of the vehicle. The search of the front cab vehicle revealed a multi-colored notepad, needles, digital scales, jump drives, seven cell phones, cut straws, and $1,404 cash. Speaker boxes and a PS3 were found in the back of the vehicle. No alcohol was found in the vehicle. The officers have no knowledge of pictures being taken following the search of the vehicle.

Swallows and Flowers were transported to the Bradley County Jail following the search of the vehicle. Detective Pike was notified by a phone call that Deputy Miller had just been involved in a traffic stop and needed assistance. Detective Pike reviewed Swallows' criminal history and noticed several federal convictions within the last ten years. Detective Pike then met with Swallows and the interview was recorded on video. At this time, Detective Pike had a Admonition and Waiver of Rights form which consisted of two sections, the first being the admonition of rights and the second being the waiver of rights. Pike read the admonition of rights section, which included the right to be silent and the right to counsel, to Swallows. At 4:50 pm, Swallows was given the Admonition and Waiver of Rights form which he signed. Pike

4

did not read the waiver of rights section of the form to Swallows; however, Swallows indicated he understood his rights. Detective Pike also told Swallows that he did not have to tell Pike anything and the interview could be over. Detective Pike began to interview Swallows after he signed the Admonition and Waiver of Rights form that informed him of his *Miranda* rights.

Swallows said he had been drinking a bit and had consumed about a gram of methamphetamine that day. His speech during the recorded interview was slow but coherent, and he was appropriately engaged in the conversation. Detective Pike did not display his firearm during the course of the interview. Swallows was not handcuffed and was allowed to sit during the interview. Swallows was not threatened or coerced. Detective Pike testified that Swallows displayed a calm demeanor at the beginning of the interview, but Swallows became uneasy as they began to talk about narcotics. At no point did Swallows indicate to Detective Pike that he did not understand what was going on in the interview or complain about his inability to understand. Detective Pike was able to understand Swallows' responses to the questions asked. Eventually, Swallows asked to speak to a lawyer and the interview was terminated. The interview lasted approximately twenty minutes.

### III. Analysis

<u>The June 17, 2012 Traffic Stop</u>:

Swallows does not contest the initial traffic stop for speeding. He does contend the initial traffic stop was unconstitutionally extended beyond its original purpose in order to "instigate a full-fledged drug investigation without probable cause." (Defendant's Memorandum, Page ID #115). After a traffic stop, in order to detain a motorist beyond the issuance of a traffic citation, an "officer must have reasonable suspicion the individual has engaged in more extensive conduct." *United States v. Townsend,* 305 F.3d 537, 541 (6th Cir. 2002). Here, before the traffic

5

stop had concluded, Swallows immediately advised Deputy Miller that he did not have a driver's license, that he had been drinking and driving, and that the vehicle did not belong to him. Shortly thereafter, Deputy Miller and later Deputy Robinson, conducted background checks which revealed Swallows' license was revoked for DUI. At this point, Deputy Miller had probable cause to arrest Swallows for driving without a license and speeding. That Deputy Miller could have issued Swallows a citation for driving on a revoked license and speeding as opposed to arresting him is of no moment as Deputy Miller clearly had the authority to arrest Swallows after observing him commit two misdemeanors in his presence. *See, e.g., Atwater v. City of Lago Vista,* 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). Deputy Miller was permitted to arrest Swallows for driving on a revoked license and driving without a license under Tennessee law. *See United States v. Byrd,* No. 94-5301, 1995 WL 72299, at *5 (6th Cir. Feb. 21, 1995) ("[W]here, as here, the defendant was driving on a suspended license, a citation in lieu of an arrest would not have been proper [under] T.C.A. § 40-7-118."); *United States v. Coats,* 335 F. Supp. 2d 871, 873 n.1 (W.D. Tenn. 2004) ("Although under Tenn. Code. § 40-7-118 an officer must issue a citation in the case of most misdemeanors instead of making a custodial arrest, in the case of driving on a revoked license, an officer has the discretion to either issue a citation or arrest the offending party."); *see also* Tenn. Code. § 55-50-351 (providing that police officers may "affect the arrest of any person" found to be driving without a license.").

The entire encounter, beginning with the initiation of the traffic stop until Swallows was arrested after a background check revealed his license was revoked for DUI lasted approximately 15 minutes. A license check is well within the bounds of a lawful traffic stop. *See United States*

*v. Garrido-Santana,* 360 F.3d 565, 573-74 (6th Cir. 2004) ("[I]t was objectively reasonable and within the bounds of the traffic stop for [law enforcement] to have requested a computer check to ensure that defendant was lawfully operating the vehicle."); *United States v. Hill,* 195 F.3d 258, 269 (6th Cir. 1999) (holding that a driver's license check is within the original scope of a traffic stop based on a traffic violation); *United States v. Wellman,* 185 F.3d 651, 656 (6th Cir. 1999) (holding that asking "defendant to sit in the squad car while [police officer] wrote a courtesy citation and performed record checks of his driver's license and registration" was within the scope of a traffic stop for speeding). I conclude any argument that Swallows' continued detention prior to his arrest was unreasonable lacks merit.

The Search of the Vehicle:

Swallows next argues that the officers lacked probable cause to search the vehicle he was driving, including the cell phones that were seized from the vehicle.[1] I conclude there are two valid bases to allow the search.

First, the search of the vehicle was a valid inventory search for which neither probable cause, nor a warrant, were required. "After lawfully taking custody of a vehicle, officers may conduct a warrantless inventory search. Such inventory searches serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *United States v. Lumpkin,* 159 F.3d 983, 987 (6th Cir. 1998) (internal marks and citation omitted). "[A] valid inventory search conducted without a warrant does not violate the Fourth Amendment." *See United States v. Smith,* 510 F.3d 641, 650 (6th Cir. 2007). An inventory search is proper where three conditions

---

[1] Swallows does not challenge the validity of the search warrants that were obtained for the cell phones; rather, he takes issue with the search of the vehicle that led to the initial seizure of the cell phones.

7

are met: "(1) police must lawfully take control of the vehicle; (2) the search must be conducted in accordance with established police routine; and (3) the police policy itself must be reasonable." *United States v. Rollins,* No. 1:09-CR-181, 2010 WL 3851403, at *4 (E.D. Tenn. Sept. 27, 2010). "A vehicle can lawfully be in police custody even though it has not yet been towed to an impound lot if such actions reflect the inventory policy of the law enforcement agency." *Id.* at 4. "Whether a police department maintains a written [inventory] policy is not determinative, where testimony establishes the existence and contours of the policy." *Smith,* 510 F.3d at 651 (internal marks and citation omitted). Testimony at the June 28, 2013 hearing supports the conclusion that the officers were following a written policy which would require the inventory of the vehicle in the circumstances which existed at the time of the inventory. Pursuant to Bradley County's standard policies and procedures, Deputy Miller seized the vehicle because it was used in the commission of a drug trafficking crime, and the subsequent inventory of the vehicle was also conducted in accordance with such policies and procedures. *See, e.g., United States v. Allen,* No. 4:08-cr-40, 2009 WL 3297286, at *5 (E.D. Tenn. Oct. 13, 2009) ("Tennessee law permits the seizure of vehicles used to transport unlawful controlled substances. . . . Believing the car to be subject to forfeiture, Officer Harris did not need a warrant to conduct an inventory search.").

  The search was also valid because there was probable cause to search the vehicle for contraband. *See United States v. Lanzon,* 639 F.3d 1293, 1300 (11th Cir. 2011) ("The fact that Detective Clifton recorded the search in the incident report as an inventory search does not change [our] conclusion. A police officer's subjective reasons for a search do not control the legal justification for his actions, as long as objective circumstances justify the search. The inquiry focuses upon whether the facts established that the officer had probable cause to search

8

the vehicle, and the officers here had probable cause to search the truck in accordance with the automobile exception.") (citation omitted); *accord Rollins,* 2010 WL 3851403, at *3.

So long as "there is probable cause to believe a vehicle contains evidence of criminal activity, [police may] search . . . any area of the vehicle in which the evidence might be found." *Arizona v.Gant,* 556 U.S. 332, 347 (2009). "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion[.]" *United States v. Jackson,* 470 F.3d 299, 306 (6th Cir. 2006) (internal marks and citation omitted). "Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Haynes,* 301 F.3d 669, 678 (6th Cir. 2002).

In this case, Deputy Miller observed Ms. Flowers remove a large bag of suspected methamphetamine from her brassiere shortly after she exited a vehicle that was stopped in a high crime area particularly known for drug activity. The two bags of suspected methamphetamine which were recovered from Ms. Flowers' person, coupled with the fact Ms. Flowers had told Deputy Robinson she was afraid of defendant and that he had directed her to hide something just before Deputy Miller approached the vehicle provided the officers with probable cause to believe the vehicle contained contraband. *See, e.g., United States v. Johnson,* 383 F.3d 538, 545-46 (7th Cir. 2004) ("Cook's discovery of a banned substance (drugs) on Johnson's person clearly provided him with probable cause to search the trunk of the vehicle, including any containers (*i.e.,* the briefcase) therein, since the officer had a reasonable basis for believing that more drugs or other illegal contraband may have been concealed inside.").

Waiver of *Miranda* Rights:

Finally, Defendant has moved to suppress his statements to police arguing that Defendant Swallows "did not knowingly, intelligently, and voluntarily waive his *Miranda* rights before

9

making any statements" (Doc. 54, Defendant's Memorandum at 2). The Defendant argues he was in a drug-induced state when he was interviewed by Detectives Pike and Musclewhite and was therefore incapable of waiving his *Miranda* rights. Further, the Defendant asserts that the interrogation "took place in a coercive environment and that those *Miranda* warnings were insufficient". (Doc. 54, Defendant's Memorandum at 4). The Government in response asserts that Swallows understood his rights, that Swallows' waiver of rights is valid, and that there was no coercion at any time.

Statements made by a suspect while in custody must be preceded by *Miranda* warnings in order for those statements to be admissible. *United States v. Crowder*, 62 F.3d 782, 785 (6th Cir. 1995). Moreover, a defendant's waiver of his *Miranda* rights must be voluntary, knowing, and intelligent. *See Moran v. Burbine*, 475 U.S. 412, 421 (1986); *United States v. Miggins,* 302 F.3d 384, 397 (6th Cir. 2002). A determination of the voluntariness of a defendant's confession is viewed under the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009). The government bears the burden of proof to show by a preponderance of the evidence through clear and positive testimony that a defendant voluntarily waived his *Miranda* rights. *Canipe*, 569 F.3d at 602 (citing *United v. Worley*, 193 F.3d 380, 385 (6th Cir. 1999)); *see also Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

The inquiry as to whether there was a valid waiver has two dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the

10

consequences of the decision to abandon it. *See Moran*, 475 U.S. at 421; *Crowder*, 62 F.3d at 787.

In determining whether a confession has been elicited by means that are unconstitutional, this Court must consider "whether a defendant's will was overborne in a particular case." *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir.1994). Factors to consider in assessing the totality of the circumstances include the age, education, and intelligence of the accused; whether the accused has been informed of his constitutional rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food or sleep. *Id.* Further, "[c]oercive police activity is a necessary element for finding that a confession was involuntary." *Abela v. Martin*, 380 F.3d 915, 928 (6th Cir. 2004), *abrogated on other grounds as recognized by Moritz v. Lafler*, 2013 WL 1777172 (6th Cir. Apr. 25, 2013), (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). Promises of leniency and threats of prosecution may also be forms of coercion which overbear an accused's will and render a confession or statement involuntary. *United States v. Johnson*, 351 F.3d 254, 261 (6th Cir. 2003); *United States v. Wrice*, 954 F.2d 406, 411 (6th Cir. 1992). The Sixth Circuit "has established three requirements for a finding that a confession was involuntary due to police coercion: (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999). The Sixth Circuit has held that "evidence that defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant conclusion that confession was involuntarily." *United States v.* Newman, 889 F.2d 88, 94 (6th Cir. 1989).

11

In this case, the Admonition and Waiver of Rights form was signed at 4:50 pm on June 17, 2012. Detective Pike testified that Defendant was advised of his *Miranda* rights prior to the interview and Defendant was given the waiver form so that he could examine it himself prior to signing the waiver. Although the Defendant asserts that he was coerced into signing the Admonition and Waiver of Rights form, the evidence indicates otherwise. There is a video of the interrogation. At no point during the interrogation did Detective Pike display his firearm. Defendant was not handcuffed. Defendant was allowed to sit during the interrogation. No threats or promises were made and the conversation was calm and polite. He did not appear impaired on the video of the interview. The entire interrogation only lasted twenty minutes and ended as soon as the Defendant asked for a lawyer.

While Defendant told Detectives Pike and Musclewhite that he had taken some methamphetamine during the day and had previously consumed alcohol, the Defendant passed a field sobriety test earlier that afternoon. In the interview, Defendant answered questions appropriately and appeared to understand what was happening around him. His prior encounters with police undoubtedly had familiarized him with *Miranda* rights. Defendant is an adult. Detective Pike read aloud and went through Defendant's *Miranda* rights with him. Defendant said he understood his rights, and he signed the written waiver form.

Defendant points to the lack of evidence in the record about his education. Although no evidence of his education level was adduced during the hearing, I am aware of his education level from his sworn testimony in the January 15, 2013 initial appearance and arraignment. At that hearing he testified to having a 10th grade education, although in special education. He testified that he in fact could read and write some. During the interview on June 17, 2012, he appeared to understand the seriousness of his predicament and to understand his rights. In fact,

12

Case 1:12-cr-00148-CLC-CHS   Document 68   Filed 09/06/13   Page 12 of 14   PageID #: 191

he eventually elected to exercise his right to ask to speak with counsel, after which the interview was immediately terminated.

The evidence and testimony presented at the suppression hearing demonstrated Swallows was sufficiently alert and coherent during the interview to be able to understand his *Miranda* rights prior to waiving same. Although his level of education may be somewhat limited, he has substantial experience with the criminal justice system, as evidenced by his multiple prior felony convictions for drug trafficking, which indicates the concept of *Miranda* was not foreign to him. *See* Doc. No. 27 (Sentencing Enhancement Information). Swallows also displayed some understanding of federal drug laws during the interview. He appeared to be aware of the questions posed to him. There is no evidence Swallows suffered from any type of mental disease or defect at the time of the interview or was otherwise unable to understand his *Miranda* rights and the consequences associated with waiving them. Swallows passed a field sobriety test approximately two hours prior to being interviewed by Detectives Pike and Musclewhite. I conclude the Defendant voluntarily and intelligently waived his *Miranda* rights when he signed the written waiver to do so.

13

Case 1:12-cr-00148-CLC-CHS  Document 68  Filed 09/06/13  Page 13 of 14  PageID #: 192

IV. Conclusion

Accordingly, for the reasons stated herein, I RECOMMENDED the Defendant's motion to suppress (Doc. 54) be DENIED.[2]

S/*William B. Mitchell Carter*
UNITED STATES MAGISTRATE JUDGE

---

[2] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).