UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 1:12-CR-148 |
| v. | ) | |
| | ) | Judge Curtis L. Collier |
| TIMOTHY JOE SWALLOWS | ) | |

**MEMORANDUM**

Defendant Timothy Joe Swallows ("Swallows") filed a motion to suppress evidence from a vehicle search as well as statements he made to law enforcement officers (Court File No. 54). The motion was referred to United States Magistrate Judge William B. Mitchell Carter, who held a hearing on June 28, 2013 and subsequently filed a Report and Recommendation ("R&R") concluding that Swallows's motion should be denied (Court File No. 68). Swallows timely objected (Court File No. 69), and the government responded to the objection (Court File No. 70). For the following reasons, the Court will **ACCEPT** and **ADOPT** the R&R (Court File No. 68). Accordingly, Swallows's motion to suppress will be **DENIED** (Court File No. 54).

**I.     RELEVANT FACTS**

The following recitation of facts is derived primarily from the Magistrate Judge's R&R. Deputy Darren Miller ("Deputy Miller") of the Bradley County Sheriff's Office was parked on the roadside in a known drug trafficking area on June 17, 2012. After his radar showed a vehicle going 40 mph in a 30 mph zone, he pulled the vehicle over and learned the driver was Swallows and the passenger was codefendant Amber Flowers ("Flowers"). Swallows, who smelled of alcohol and admitted at the beginning of the traffic stop that he had been drinking, was unable to produce a driver's license. Swallows passed the three sobriety tests administered by Deputy Miller. After arriving on the scene to assist, Deputy Tim Robinson learned that Swallows's driver's license had

been revoked. Deputy Miller took Swallows into custody based on state law and Bradley County Sheriff's Office policy permitting custodial arrest for driving on a revoked or suspended license.

Upon learning Flowers had an outstanding warrant for methamphetamine precursors, the deputies also took her into custody. After informing Flowers of her *Miranda* rights, Deputy Miller asked Flowers whether she had anything illegal on her. She said she did not. Asked a second time, she invited the deputy to shake her bra and search her himself. Deputy Miller declined. After being uncuffed, Flowers took a large bag of methamphetamine out of her bra. As she did so, another bag of methamphetamine fell to the ground. The entire stop took fifteen to twenty minutes.

Following the arrests, the deputies conducted an inventory search of the vehicle before having it towed. Deputy Miller also testified that he believed there was probable cause to search the vehicle, given the drugs found on Flowers and that the vehicle was stopped in an area known for drug trafficking. The search turned up syringes, digital scales, jump drives, seven cell phones, cut straws, and $1,404 in cash.

Detectives Zechary Pike ("Det. Pike") and Joe Musselwhite ("Det. Musselwhite") of the Bradley County Sheriff's Office interviewed Swallows at the Bradley County jail. After sitting down together, Det. Pike placed a standard Admonition and Waiver of Rights form in front of Swallows. The detective read the admonition section to Swallows, which informed Swallows of his *Miranda* rights, and then said "if you're willing to speak with me, sign your name and print right there," pointing to the signature portion of the form. Swallows signed the form and answered Det. Pike's questions for about twenty minutes, after which he invoked his right to a lawyer and the interview promptly ended.

During the interview, Swallows said that earlier in the day he had "been drinking a bit" and

2

done "maybe a gram" of methamphetamine. Swallows, who sat uncuffed, carried on a coherent conversation with Det. Pike, who conducted the questioning, and Swallows showed no indication that he did not understand the questions. The detectives remained seated during the interview, maintained a conversational tone, and did not display a weapon or otherwise engage in intimidating behavior. During the course of the interview, Swallows made several incriminating statements.

Swallows filed the instant motion to suppress based on two grounds: (1) that the evidence from the vehicle search should be suppressed because his Fourth Amendment rights were violated, and (2) that his statements during the post-arrest interview should be suppressed because his Fifth Amendment rights were violated. Regarding the Fourth Amendment claims, the Magistrate Judge concluded that the deputies lawfully seized and arrested Swallows for driving on a revoked license. The Magistrate Judge also determined that the search was proper, either as an inventory search pursuant to Sheriff's Office policy or because probable cause arose after finding the methamphetamine on Flowers. Regarding the Fifth Amendment claims, the Magistrate Judge concluded that Swallows intelligently and voluntarily waived his Miranda rights. The Magistrate Judge noted that the video of the interview showed that Swallows was read his rights, agreed to answer questions (evidenced in part by signing a *Miranda* waiver), and proceeded to coherently answer questions in a calm and non-coercive environment.

After the Magistrate Judge filed his R&R, Swallows timely filed an objection. Swallows objects to the Magistrate Judge's conclusion that there was probable cause to arrest Swallows. He also objects to the conclusion that the vehicle search was proper as an inventory search or because there was probable cause. Finally, Swallows objects to the conclusion that Swallows voluntarily and knowingly waived his *Miranda* rights.

## II. STANDARD OF REVIEW

This Court must conduct a *de novo* review of those portions of the R&R to which objection is made. 28 U.S.C. § 636(b)(1)(C). But *de novo* review does not require the district court to rehear witnesses whose testimony has been evaluated by the Magistrate Judge. *See United States v. Raddatz*, 447 U.S. 667, 675-76 (1980). The Magistrate Judge, as the factfinder, had the opportunity to observe and hear the witnesses and assess their demeanor, putting him in the best position to determine credibility. *See Moss v. Hofbauer*, 286 F.3d 851, 868 (6th Cir. 2002); *United States v. Hill*, 195 F.3d 258, 264-65 (6th Cir. 1999). The Magistrate Judge's assessment of witnesses' testimony is therefore entitled to deference. *United States v. Irorere*, 69 F. App'x 231, 236 (6th Cir. 2003).

## III. DISCUSSION

### A. Arrest

Swallows objects to the Magistrate Judge's conclusion that there was probable cause to arrest him. Swallows does not contest the initial traffic stop for speeding, but argues that the deputies impermissibly extended the stop beyond what was reasonable for issuance of a speeding citation and, further, should not have arrested Swallows even after determining that he was driving on a revoked license.

The Court agrees with the Magistrate Judge that Deputy Miller did not impermissibly extend the stop or improperly detain Swallows. At the very beginning of the encounter, Swallows advised Deputy Miller that Swallows did not have a driver's license—itself an arrestable offense in Tennessee. Tenn. Code Ann. § 55-50-351. Shortly after this admission, the deputies learned that

4

Swallows was in fact driving on a revoked license. The entire traffic stop took between fifteen and twenty minutes, a reasonable length of time.[1]

The arrest itself was also proper. Under the United States Constitution and Tennessee law, a suspect may be arrested if a law enforcement officer witnesses the suspect driving on a revoked license. "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). Further, although under Tenn. Code Ann. § 40-7-118 issuance of a citation instead of arrest is required for most misdemeanors, "in the case of driving on a revoked license, an officer has the discretion to either issue a citation or arrest the offending party." *United States v. Coats*, 335 F. Supp. 2d 871, 873 n.1 (W.D. Tenn. 2004) (citing Tenn. Code Ann. § 40-7-118(b)(3)(C)); *see also* Tenn. Code Ann. § 55-50-351 (permitting law enforcement officers to "effect the arrest" of any person found driving without a license). Thus, the Magistrate Judge correctly concluded that Swallows's arrest did not violate the Fourth Amendment.

**B. Vehicle Search**

Swallows also objects to the Magistrate Judge's conclusion that the vehicle search did not violate the Fourth Amendment because it was either a proper administrative search or there was probable cause. Swallows cites *Arizona v. Gant*, 556 U.S. 332 (2009), for the proposition that

---

[1] It should be noted that as a matter of course officers are permitted to carry out license checks during traffic stops, and, if conducted reasonably, such activity does not impermissibly extend a stop. *See e.g.*, *United States v. Garrido-Santana,* 360 F.3d 565, 573-74 (6th Cir. 2004) (finding that it was "objectively reasonable and within the bounds of the traffic stop for [law enforcement] to have requested a computer check to ensure that defendant was lawfully operating the vehicle."); *United States v. Wellman,* 185 F.3d 651, 656 (6th Cir. 1999) (holding it was lawful for an officer to "ask[] defendant to sit in the squad car while he wrote a courtesy citation and performed record checks of his driver's license and registration").

incident to arrest, law enforcement may only search a vehicle for evidence of the suspected crime or to ensure the safety of officers. Thus, concludes Swallows, the deputies should have not searched his vehicle while he was safely secured in the back of a patrol car, having been arrested for driving on a revoked license, a crime for which evidence would not be found in the vehicle. Swallows correctly states *Gant*'s holding with respect to searches incident to arrest, but he incorrectly dismisses two other grounds for a search: an inventory search and a search when there is probable cause to believe evidence of another crime will be found in the vehicle.

It does not violate the Fourth Amendment for law enforcement to conduct a warrantless search of a vehicle upon taking custody of it. *United States v. Lumpkin,* 159 F.3d 983, 987 (6th Cir. 1998). "Such inventory 'searches serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger.'" *Id.* (quoting *Colorado v. Bertine*, 479 U.S. 367, 372 (1987)). Three requirements apply to inventory searches: (1) police must lawfully take custody of the vehicle; (2) the search must be conducted in accordance with established police procedures and not for the purpose of investigation, and (3) the police policy itself must be reasonable. *United States v. Rollins*, 1:09-CR-181, 2010 WL 3851403 (E.D. Tenn. Sept. 27, 2010) (citing *United States v. Smith*, 510 F.3d 641, 651 (6th Cir. 2007)); *see also Florida v. Wells*, 495 U.S. 1, 5 (1990); *United States v. Tackett*, 486 F.3d 230, 232 (6th Cir.2007).

A vehicle can lawfully be in law enforcement custody even though it has not yet been towed to an impound lot, if this reflects the inventory policy of the law enforcement agency. *See United States v. Kimes*, 246 F.3d 800, 804 (6th Cir. 2001). Bradley County Sheriff's Office General Order 1.2.4 provides that deputies conduct an inventory search prior to towing a vehicle, which is what

6

occurred here.

It was established during the hearing that the deputies were following a written Sheriff's Office procedure to seize—and in doing so conduct an inventory search of—vehicles suspected of being involved in drug trafficking. *See* Bradley County Sheriff's Office General Order 61.4.3. Soon after Swallows was arrested, the deputies' questioning of Flowers resulted in her producing two bags containing a significant amount of methamphetamine. This established that the vehicle possibly was being used for drug trafficking, which provided an adequate ground for taking custody of the vehicle and conducting an inventory search.

Such a policy is reasonable. *See Smith*, 510 F.3d at 651 ("[W]here police have probable cause to believe a car is subject to forfeiture, or have validly seized a car for forfeiture, the police may search the car without a warrant.") (internal quotation marks omitted); *United States v. Allen*, 4:08-CR-40, 2009 WL 3297286 (E.D. Tenn. Oct. 13, 2009) (noting that because "Tennessee law permits the seizure of vehicles used to transport unlawful controlled substances," it was permissible for an officer to conduct a warrantless inventory search of a vehicle he suspected was being used to sell narcotics).

The search can also be supported by probable cause. And there need not be tension between upholding a search under both the inventory search and probable cause standards, as "the mere fact that an officer suspects that contraband may be found in a vehicle does not invalidate an otherwise proper inventory search." *Smith*, 510 F.3d at 651. Here, the ground for taking the vehicle into custody—that it appeared to be involved in drug trafficking—also provided probable cause to search the vehicle without a warrant. "If there is probable cause to believe a vehicle contains evidence of criminal activity," officers may without a warrant search "any area of the vehicle in which the

7

evidence might be found." *Gant*, 556 U.S. at 347 (citing *United States v. Ross*, 456 U.S. 798, 820–821 (1982)); *see also United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998) ("Under the automobile exception to the warrant requirement, law enforcement officers may search a readily mobile vehicle without a warrant if they have probable cause to believe that the vehicle contains evidence of a crime.")

"Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (internal quotation marks and citation omitted). The determination is a "commonsense, practical question" based upon the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983). And "[t]his totality of the circumstances analysis includes a realistic assessment of the situation from a law enforcement officer's perspective," taking into account law enforcement training and experience. *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993).

In the present case, deputies watched Flowers remove a large bag of methamphetamine from her bra, as another bag fell to the ground. Finding illegal drugs on a person who has just exited a vehicle can provide probable cause to believe further evidence of a drug crime might be found in the vehicle. *See e.g.*, *United States v. Johnson*, 383 F.3d 538, 545 (7th Cir. 2004) (An officer finding a small amount of cocaine in a driver's hat "alone provided [the officer] with probable cause that a crime had been, or was being committed and, therefore, he was not violating [the defendant's] constitutional right when searching the vehicle, including the trunk."). Further, the traffic stop here occurred in a neighborhood known to the deputies for drug trafficking. Under the totality of the circumstances, there was a fair probability that further evidence of drug trafficking would be found in the vehicle.

8

**C.** *Miranda* **Waiver**

In objecting to the Magistrate Judge's Fifth Amendment analysis, Swallows argues that even though he was read his *Miranda* rights, he neither understood nor voluntarily waived them. The Fifth Amendment protects a person from being compelled to incriminate him or herself. *See, e.g.*, *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). A suspect who is in custody and subject to interrogation must be given *Miranda* warnings against self-incrimination. *Miranda*, 384 U.S. at 467-68. Because of the pressures and psychological stress exerted on those in custody, law enforcement officers are required to adequately and effectively apprise such individuals of their rights and must fully honor their decision should they seek counsel before answering questions. *Id.* at 467. If an individual agrees to answer questions without counsel, the officer can then question the individual freely. *Davis v. United States*, 512 U.S. 452, 458 (1994). The government bears the burden of establishing a waiver by the preponderance of the evidence. *United States v. Adams*, 583 F.3d 457, 467 (6th Cir. 2009) (citing *United States v. Nichols*, 512 F.3d 789, 798 (6th Cir. 2008)). A "waiver of *Miranda* rights must be voluntary, that is, 'the product of a free and deliberate choice rather than intimidation, coercion or deception.'" *Id.* (quoting *Machacek v. Hofbauer*, 213 F.3d 947, 954 (6th Cir.2000). Voluntariness of a defendant's confession is determined under the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009). A waiver must also be "'made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Daoud v. Davis*, 618 F.3d 525, 529 (6th Cir. 2010) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

As the Magistrate Judge concluded, the evidence points to a properly given *Miranda* warning followed by Swallows's intelligent and voluntary waiver. Swallows asserts he was too intoxicated

9

to understand his rights, but the evidence indicates otherwise. In the taped interview, Swallows appears to have understood each question put to him and gives coherent—though sometimes evasive—answers. Also, it is notable that he passed all the field sobriety tests administered during the traffic stop. The Magistrate Judge, who was best able to determine credibility of the witnesses, was not convinced that any lingering effects of drugs or alcohol were enough to prevent an intelligent and voluntary waiver. Swallows does not provide persuasive evidence to the contrary.

Swallows also asserts that waiver was inadequate because Det. Pike did not read the waiver portion of the Admonition and Waiver of Rights form aloud and specifically ask him to waive his *Miranda* rights, and that Swallows never waived: "[Swallows] was simply read his rights, and he stated he understood those rights. However, he was never asked whether he would waive the rights and he did not in fact waive his right to have counsel present at the interview" (Court File No. 51). Miranda, however, does not require express waiver. "If the [prosecution] establishes that a Miranda warning was given and the accused made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate 'a valid waiver' of Miranda rights." *Berghuis v. Thompkins*, 560 U.S. 370, 130 (2010) (citing *Miranda*, 384 U.S. at 475). In other words, "[w]here the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Id.*

Here, Swallows admits that after being read his *Miranda* rights, "he stated he understood those rights" (Court File No. 51). There is no reason to believe he did not. Swallows, an adult with a 10th grade education, has incurred multiple felony convictions that likely familiarized him with his rights under *Miranda.* Further, the video of the interview shows Det. Pike reading Swallows his *Miranda* rights and then pointing to the waiver form and saying "if you're willing to speak with me,

10

sign your name and print right there." Swallows signs the waiver form and proceeds to answer questions in a sufficiently alert and coherent manner. Although Swallows may have limited education, there was no evidence he suffered from a mental disease or defect that would inhibit his understanding of the rights read to him. There is sufficient evidence to establish intelligent waiver.

Also, there was no indication of a coercive environment that would undermine the voluntariness of waiver. Detectives Pike and Musselwhite never display a firearm, and they remain seated and calm the entire interview. Neither makes any threats or promises. Swallows also remains seated, and the interview, which lasted about twenty minutes, ends promptly when he asks for a lawyer. The Court agrees with the Magistrate Judge that the interview statements were not taken in violation of the Fifth Amendment.

## IV. CONCLUSION

For the foregoing reasons, the Court will **ACCEPT** and **ADOPT** the R&R (Court File No. 68). Defendant's motion to suppress will be **DENIED** (Court File No. 54).

**An Order Shall Enter.**

/s/
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**